# UNITED STATES DISTRICT COURT
## DISTRICT OF RHODE ISLAND

|  |  |
|---|---|
| DAVID DECAPUA, individually and on behalf of all others similarly situated,<br><br>        Plaintiff,<br><br>v.<br><br>METROPOLITAN PROPERTY AND CASUALTY INSURANCE COMPANY,<br><br>        Defendant, | **Case No.**<br><br><br>**CLASS ACTION COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF PURSUANT TO 47 U.S.C. § 227 *ET SEQ*. (TELEPHONE CONSUMER PROTECTION ACT)**<br><br>**CLASS ACTION**<br><br><br><u>**DEMAND FOR JURY TRIAL**</u> |

Plaintiff David DeCapua (hereinafter referred to as "Plaintiff"), individually and on behalf of all others similarly situated, alleges on personal knowledge, investigation of his counsel, and on information and belief, as follows:

## <u>NATURE OF ACTION</u>

1. This case involves a campaign by Metropolitan Property and Casualty Insurance Company (hereafter referred to as "MetLife" or Defendant) to market its products and services through the use of automated text messages in plain violation of the Telephone Consumer Protection Act, 47 U.S.C. § 227 *et seq*. (hereinafter referred to as the "TCPA").

2. Specifically, MetLife employee Rick Lee or his subordinates used software called "EZ Texting" to transmit thousands of unsolicited spam text messages to Plaintiff and proposed Class Members for the purposes of marketing its insurance policies, including as many as 8,000 such text messages through the EZ Texting System during the week of July 16, 2018 alone.

3. Metlife had obtained Plaintiff's contact information from a "Colex Data" (an apparent reference to a data-mining product called "Cole X-Dates"), not from Plaintiff.

4.     By using an automated telephone dialing system to send thousands of automated telemarketing text messages without first obtaining the prior express written consent of recipients, MetLife violated the TCPA.  The recipients of MetLife's illegal text messages, which include Plaintiff and the proposed class, are entitled to damages under the TCPA.

## PARTIES

5.     Plaintiff David DeCapua is, and at all times mentioned herein was, an individual citizen of the State of Ohio, who resides in Columbus, Ohio.

6.     Metropolitan Property and Casualty Insurance Company ("MetLife") is a corporation incorporated under the laws of the State of Rhode Island, having its principle place of business at 700 Quaker Lane, Warwick, Rhode Island.  MetLife employs Rick Lee, an individual who sells MetLife insurance from Ohio.

## JURISDICTION AND VENUE

7.     This Court has subject matter jurisdiction pursuant to the Class Action Fairness Act of 2005 ("hereinafter referred to as CAFA") codified as 28 U.S.C. 1332(d)(2).  The matter in controversy exceeds $5,000,000, in the aggregate, exclusive of interest and costs, as each member of the proposed Class of thousands is entitled to up to $1,500.00 in statutory damages for each call that has violated the TCPA.  Further, Plaintiff alleges a national class, which will result in at least one Class member from a different state.

8.     This Court also has federal question jurisdiction pursuant to 28 U.S.C. § 1331 and 47 U.S.C. § 227 *et seq.*

9.     This Court has personal jurisdiction over MetLife because the company is incorporated and headquartered in the state of Rhode Island.  The text messages that are the subject of this case were created and sent by MetLife.

- 2 -

1630256.9

10.     Venue is proper in the United States District Court for the District of Rhode Island because Defendant is deemed to reside in any judicial district in which they are subject to personal jurisdiction at the time the action is commenced, and because MetLife is incorporated and headquartered in Rhode Island.

## THE TELEPHONE CONSUMER PROTECTION ACT OF 1991 (TCPA), 47 U.S.C. § 227

11.     The TCPA regulates, among other things, the use of an automated telephone dialing system ("ATDS") to make calls or send text messages. *See* 47 U.S.C. § 227, *et seq.*; *In re Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991, Report and Order*, 18 FCC Rcd. 14014, 14115 ¶ 165 (2003).

12.     Specifically, the TCPA prohibits the use of an automated telephone dialing system to make any telemarketing call or send any telemarketing text message to a wireless number in the absence of an emergency or the prior express written consent of the called party. *See* 47 U.S.C. § 227(b)(1)(A)(iii); 47 C.F.R. § 64.1200(a)(2); *In the Matter of Rules & Regulations Implementing the Tel. Consumer Prot. Act of 1991*, 27 F.C.C. Rcd. 1830, 1831 (F.C.C. 2012).

    a.     The TCPA defines an "automatic telephone dialing system" as "equipment which has the capacity—(A) to store or produce telephone numbers to be called, using a random or sequential number generator; and (B) to dial such numbers." § 227(a)(1)(A)-(B). The first component of this definition is satisfied when a dialing system has the capacity to call "a given set of numbers" or when "dialing equipment is paired with . . . a database of numbers." *In re Rules & Regulations Implementing the Telephone Consumer Protection Act of 1991*, 18 FCC Rcd. 14,014, ¶ 133 (2003); *see In the Matter of Rules & Regulations Implementing the Tel. Consumer Prot. Act of 1991*, 23 F.C.C. Rcd. 559, 566

1630256.9

(F.C.C. 2008) (rejecting argument that a dialing system "meets the definition of autodialer only when it randomly or sequentially generates telephone numbers, not when it dials numbers from customer telephone lists" and reasoning that "the teleservices industry had progressed to the point where dialing lists of numbers was far more cost effective"); *Marks v. Crunch San Diego, LLC*, No. 14-56834, 2018 WL 4495553, at *8 (9th Cir. Sept. 20, 2018) (holding that "equipment that made automatic calls from lists of recipients was . . . covered by the TCPA").[1]

      b.    "[T]elemarketing means the initiation of a telephone call or message for the purpose of encouraging the purchase or rental of, or investment in, property, goods, or services, which is transmitted to any person."  47 C.F.R. § 64.1200(f)(12).

      c.    "[P]rior express written consent means an agreement, in writing, bearing the signature of the person called that clearly authorizes the seller to deliver or cause to be delivered to the person called advertisements or telemarketing messages using an automatic telephone dialing system or an artificial or prerecorded voice, and the telephone number to which the signatory authorizes such advertisements or telemarketing messages to be delivered."  47 C.F.R. § 64.1200(f)(8).

13.    Under the TCPA, the burden is on the seller – here, MetLife – to have obtained and documented, and to prove, prior express written consent.

## FACTUAL ALLEGATIONS

## I.    MetLife Used a Product Called Cole X-Dates to Obtain the Names and Phone Numbers of Telemarketing Prospects, Including Plaintiff.

14.    Plaintiff does not currently hold an insurance policy with MetLife.

---

[1] In 2018, a decision struck down portions of a 2015 FCC Order, but some courts have held that "the prior FCC Orders [concerning the definition of automated telephone dialing system] are still binding."  *See, e.g., Reyes v. BCA Fin. Servs., Inc.*, Case No. 16-24077-CIV, 2018 WL 2220417, at *11 (S.D. Fla. May 14, 2018).

1630256.9

15.     Plaintiff did not ever hold an insurance policy with MetLife.

16.     Plaintiff did not ever provide his phone number to MetLife, or otherwise interact with MetLife. Plaintiff also did not ever provide his phone number to MetLife employee Rick Lee.

17.     Plaintiff does not recall ever providing prior express written consent permitting MetLife to contact him.

18.     Nonetheless, on July 19, 2018, Plaintiff received a text message, which read: "Hi David, is your home properly insured? METLIFE offers 100% replacement cost. Let us help find the right coverage for you. Text SECURITY to 313131 or call 614-527-4980 visit https://clk2.me/QuVVa 2end msgs reply STOP."

19.     In the summer of 2018, after receiving this unsolicited telemarketing text message, Plaintiff called the number listed in the message and was directed to the office of Rick Lee, an employee of MetLife.  Mr. Lee's assistant informed Plaintiff that MetLife had obtained his contact information from a marketing firm that mines public information for potential contacts that meets a particular set of criteria.

20.     During the call with Mr. Lee's assistant, Plaintiff heard Mr. Lee's assistant name the marketing firm as "Colex Data."

21.     Upon information and belief and based on further investigation, Mr. Lee's assistant was referring to a marketing product that is called "Cole X-Dates."  This product is offered by Cole Information Services, Inc., a corporation incorporated and headquartered in Nebraska.  Cole X-Dates is specifically designed for insurance agents.

22.     Upon information and belief, MetLife and/or its employee, Rick Lee, has a subscription to use Cole X-Dates.  To subscribe to Cole X-Dates, MetLife only needed to "[p]ay

one low annual subscription." This subscription permits "UNLIMITED searches and downloads" and "[s]eamless uploading into one of our integration partners (CRMs, *Dialers*, etc.), downloading into Excel or calling from the screen!" Cole Information Services, Inc. "Insurance" Webpage, *available at* https://www.coleinformation.com/insurance/ (last accessed 10/10/2018).

23.     According to Cole Information Services, Inc., Cole X-Dates is "a beautifully simple solution to inform insurance agents like you whose insurance is expiring and when. X-Dates delivers real-time accurate information, including *home phones, cell phones*, and emails that will allow you to have the right conversation with prospects and current policyholders at the right times. Cole X-Dates is flexible, plugging directly into your CRM [(an acronym standing for customer relationship management system, typically a database)], quoting software, *and autodialer . . . .*" Cole X-Dates Intro Video, *available at* https://www.youtube.com/watch?time_continue=55&v=acnpWk-JY9k (last accessed 10/9/2018) (emphasis added). Upon information and belief, this quotation accurately describes the Cole X-Dates product used by MetLife.

24.     According to Cole Information Services, Inc., a subscriber to Cole X-Dates can obtain an Excel spreadsheet or .csv file containing names and phone number information of potentially thousands of people. Specifically, a user can take the following simple steps to obtain such a spreadsheet or .csv file containing names and phone numbers of marketing prospects: (1) "Login." (2) "Simply enter a geo starting point and you can connect with homeowners whose home policy is expiring. You determine how many leads and how often you want to prospect them." (3) "Download your prospect list into Excel, mailing labels, CSV or upload into one of our integrated CRMs or Dialer partners." (4) "Start prospecting!" Cole

Information Services, Inc. "Insurance" Webpage, *available at*

https://www.coleinformation.com/insurance/ (last accessed 10/10/2018).  Upon information and

belief, the cited webpage accurately describes the steps for obtaining names and phone numbers

for prospects through Cole X-Dates.

25.    According to Cole Information Services, Inc., "The data that powers our

prospecting solutions is sourced thru public records and responder channels."  Cole Information

Services, Inc. Webpage "Insurance," *available at* https://www.coleinformation.com/insurance/

(last accessed 10/10/2018).  "Consumer contact information is cross-referenced and triangulated

against our provider's master database, and other national active marketing as well as

transactional databases. . . . The consumer database is a multi-channel, multi-sourced national

consumer database built in a hybrid manner using both compiled and proprietary response data

sources."  Cole Information Services Webpage Concerning "Our Data," *available at*

https://www.coleinformation.com/our-data/ (last accessed 10/10/2018).[2]  These sources include:

"[p]remier data compilers including: Public and courthouse records, real property information,

phone directories, consumer surveys, self-reported, and purchase transactions" and "[r]esponse

source contributors such as niche segmentation schemes and premium datasets, publishers,

catalogers, destination and online sites, plus proprietary interactive campaign results."  *Id.*

26.    Upon information and belief and based on these statements by Cole Information

Services, Inc., Cole Information Services, Inc. does not obtain prior express written consent from

consumers permitting its clients (including, in this case, MetLife) to call or send text messages to

the phone numbers it sells through Cole X-Dates.

---

[2] This webpage is linked to a "LEARN MORE" hyperlink in the "Where Do You Get Your
Data?" section of a webpage promoting Cole X-Dates.  *See* Cole Information Services, Inc.
Webpage "Insurance," *available at* https://www.coleinformation.com/insurance/ (last accessed
10/10/2018).

27.     Upon information and belief and based upon the statements of Mr. Lee's assistant, MetLife, through its employees (including Rick Lee), used Cole X-Dates to obtain lists of prospects that included names and phone numbers (among other information) without the prior express written consent of the people included on the list.

28.     Upon information and belief and based on Cole Information Services, Inc.'s descriptions of Cole X-Dates, MetLife received lists of names and phone numbers from Cole X-Dates as Microsoft Excel files, .csv files, or as data directly loaded to a MetLife database or the EZ Texting System.  *See* ¶ 24, above (describing Step 3 for obtaining such lists).

29.     Upon information and belief and based on the statements of Mr. Lee's assistant, MetLife through its employees (including Rick Lee), obtained Plaintiff's name and cell phone number (among other information) as part of a broader effort to obtain lists of prospects through Cole X-Dates and send unsolicited text messages to them.  Mr. Lee's assistant indicated to Plaintiff that Plaintiff was one of thousands of prospects that received unsolicited text messages from MetLife in a single week.

30.     In light of the economic incentives arising from the annual subscription fee structure offered by Cole X-Dates (which permits "UNLIMITED searches and downloads" of prospect information, *see* ¶ 22, above), it is likely that MetLife used Cole X-Dates for more than a single week, and that it sent thousands or perhaps tens of thousands of additional unsolicited text messages to phone numbers obtained through Cole X-Dates.

## II.     MetLife Used the EZ Texting System to Send Thousands of Unsolicited Text Messages Marketing Its Products, Including to Plaintiff's Cellular Phone.

31.     "EZ Texting" is a cloud-based software application whereby users log into their account using an identifier and a password.  EZ Texting is sold by EZ Texting, Inc., which was acquired by CallFire, Inc. in 2013.  To distinguish between the software and the company that

- 8 -

sells it, this Complaint refers to the software as "The EZ Texting System" and to the company EZ Texting, Inc. by its formal entity name.

32.    As the name "EZ Texting" suggests, the EZ Texting System is designed to enable users to send automatically hundreds of thousands of text messages on a mass basis, as demonstrated by EZ Texting, Inc.'s own statements and other public record sources concerning the EZ Texting System.

a.    EZ Texting, Inc.'s promotional materials state: "Want to send a text message campaign easily? With EZ Texting's mass SMS text program, you can send hundreds of SMS texts with the click of a button." EZ Texting Webpage, *available at* https://www.eztexting.com/new/text-from-computer (last accessed 10/1/2018). Upon information and belief, the EZ Texting System does in fact enable users to send hundreds of SMS texts with the click of a button.

b.    EZ Texting, Inc. claims on its website that its software enables users to "[r]each thousands of contacts at once with mass texting alerts and reminders" and "[w]e've sent over 4 billion messages . . . and counting." EZ Texting Webpage, *available at* https://www.eztexting.com/ (last accessed 10/1/2018). Upon information and belief, over 4 billion text messages have been sent using the EZ Texting System.

c.    CallFire, Inc. (EZ Texting, Inc.'s parent company) claims that the EZ Texting System "is scalable to hundreds of thousands of messages." CallFire Webpage titled "SMS Text Marketing by EZ Texting," *available at* https://www.callfire.com/products/sms-text-marketing-by-ez-texting (last accessed 10/10/2018).

1630256.9

d.      One online review of the EZ Texting System states: "I never thought that message tool nowadays it could be so useful, you can improve your business sending and be receiving text of a specific topic, you are able to reach more people because this technology is more friendly than use a social network, and you can save money with their plans, because you can send thousands of sms with only one pay."  Review titled "Message tool to improve your business," *available at* https://www.getapp.com/it-communications-software/a/ez-texting-sms-marketing/reviews/ (last accessed 10/10/2018).

33.      MetLife and/or its employee, Rick Lee, have a subscription or account that gives MetLife the ability to create text message campaigns and send bulk text messages using the EZ Texting System.

34.      Upon information and belief and based on the statements of Mr. Lee's assistant and the text messages received by Plaintiff, MetLife used name and phone number information obtained from Cole X-Dates to create lists of phone numbers to receive telemarketing text messages advertising MetLife's insurance policies.

35.      Upon information and belief and based upon the statements of Mr. Lee's assistant, as well as Cole Information Services, Inc.'s and EZ Texting, Inc.'s descriptions of their respective products, MetLife mass-uploaded or pasted lists of names and phone numbers received from Cole X-Dates for storage on the EZ Texting System.  The technical steps for storing phone numbers on the EZ Texting System are explained in more detail in Section III(A) below.

36.      MetLife then used the EZ Texting System to send thousands of automated text messages without manually dialing or typing the phone numbers registered to each text

1630256.9

recipient's phone.  The technical steps for how the EZ Texting System was likely used to send mass text messages are explained in more detail in Section III(C) below.

37.    On July 19, 2018, on or about 12 p.m. EDT, Plaintiff received an automated text on his cell phone message as part of MetLife's texting campaign, orchestrated through the EZ Texting System.  As alleged above, the message stated: "Hi David, is your home properly insured?  METLIFE offers 100% replacement cost.  Let us help find the right coverage for you. Text SECURITY to 313131 or call 614-527-4980 visit https://clk2.me/QuVVa 2end msgs reply STOP"

38.    The plain text of the text message received by Plaintiff (cited in the paragraph above) demonstrates that the message was sent for the purpose of encouraging the purchase or rental of, or investment in, property, goods, or services, which is transmitted to any person.  This message therefore qualified as telemarketing.  47 C.F.R. § 64.1200(f)(12).

39.    This message's use of the short code[3] "313131" confirms that the message was sent through the EZ Texting System, which, as explained above, is an automatic telephone dialing system under the TCPA.  *See* ¶ 35, above.  The short code "313131" is officially registered to EZ Texting, Inc. in the U.S. Short Code Directory, and EZ Texting, Inc. also admitted that the EZ Texting System uses the short code "313131" in a declaration filed the Southern District of New York in *Club Texting, Inc. v. T-Mobile USA, Inc.*

---

[3] EZ Texting, Inc.'s instructional materials explain: "A short code is a five- or six-digit number that people typically send a text message to in order to subscribe to a texting campaign or take part in a survey.  Most people will have seen an advertisement inviting them to 'text JOIN to 313131.'  The keyword in the advertisement is 'join' and 313131 is the short code. . . . *Please note that the reason we keep referring to 'short code 313131' is because it is one of the shared short codes used by EZ Texting clients*."  EZ Texting, Inc. Webpage, "Short Code Facts – What Are Short Codes and Keywords," *available at* https://www.eztexting.com/what-are-short-codes-and-keywords (last accessed 10/8/2018) (emphasis added).

40.     Moreover, Plaintiff was told by Mr. Lee's assistant that the text message had been sent to him through the EZ Texting System, and that at least 8,000 similar text messages had been sent in the week of July 16, 2018 alone.

41.     Upon information and belief, the text message campaign that resulted in Plaintiff receiving a text message from MetLife was programmed to automatically insert the intended text recipient's name from the list MetLife obtained from Cole X-Dates.  The EZ Texting System readily enables users to create messages that automatically insert the names that correspond to phone numbers on a list.  *See* EZ Texting Support, "Send a Text," *available at* https://answers.eztexting.com/hc/en-us/articles/360002314173-Send-a-Text (last accessed 10/1/2018) (describing means of "personalizing" the message by using tools that "add the real name [of the recipient] in *automatically* when the message gets sent.") (emphasis added).  Upon information and belief, MetLife used this feature and name and number information provided by Cole X-Dates to automatically insert names of intended text recipients into thousands of unsolicited text messages.

III.    **The EZ Texting Software Used by MetLife Is an Automated Telephone Dialing System.**

    A.    **The EZ Texting System Has the Capacity to Store Phone Numbers from a List.**

42.     The EZ Texting System has the capacity to store lists of phone numbers that are saved to any spreadsheet or .csv file.

    a.     For example, users can load spreadsheets or .csv files containing potentially hundreds of thousands of phone numbers to the EZ Texting System by selecting a button on the System's user interface marked "Mass Upload Contacts" and selecting a locally saved spreadsheet or .csv file to upload from the location where it is saved on the user's local hard drive.

- 12 -

1630256.9

    b.      Upon information and belief, MetLife employees, including those responsible for contact centers, regularly use Microsoft Excel, as demonstrated by the fact that publicly available job postings by MetLife and its affiliates seek candidates with proficiency in Microsoft Excel.

    c.      Upon information and belief, the process of storing a list of phone numbers to the EZ Texting System requires less than five minutes of configuration and is as easy as attaching a document to an email.  EZ Texting, Inc. acknowledges: "Uploading a spreadsheet of your . . . contacts is as simple as a few clicks."  EZ Texting Website, *available at* https://www.eztexting.com/help/getting-started/upload-contacts (last accessed 10/1/2018).  As one of EZ Texting, Inc.'s training videos explains: "If you want to add a large amount of contacts at once, use the Mass Upload Contacts tools to add a spreadsheet . . . ."  *Getting Started with EZ Texting!*, *available at* https://www.youtube.com/watch?v=arzbDSNdGXY (last accessed 10/1/2018).  The demonstration in the video is only a little over 3 minutes long and walks through all the steps necessary to send mass text messages with easy texting.  Screenshots showing how to mass upload contacts have been reproduced below.

- 13 -





43.    In addition to having the capacity to store a list of phone numbers loaded through a spreadsheet or .csv file, the EZ Texting System can also store a list of phone numbers that a

1630256.9

user copies and pastes into the EZ Texting System user interface.  This process involves selecting the "Paste Phone Numbers" tab on the EZ Texting System, highlighting phone numbers from a separate document, hitting copy, and hitting paste.  Using this feature, a user can store thousands of phone numbers to EZ Texting in a matter of seconds by selecting a list of phone numbers, hitting copy and pasting the phone numbers.  A screenshot of the "Paste Phone Numbers" tab on the EZ Texting System is reproduced below.



44.    Once a  list of phone numbers is stored to the EZ Texting System (including by the two methods mentioned above), the phone numbers are stored in the EZ Texting System's "Contact List," which, upon information and belief (and based on the below screenshots), is a sorted database containing at least the following fields for each entry: (1) phone number, (2) first name, (3) last name, (4) email address, (5) groups, (6) source, and (7) date added.  According to one of the training videos published by EZ Texting, Inc., this database of contacts can be viewed by the user from the "Contacts & Groups" tab on the EZ Texting System user interface.  A

screenshot from this video is reproduced below. *See Getting Started with EZ Texting!*, *available at* https://www.youtube.com/watch?v=arzbDSNdGXY (last accessed 10/1/2018).



45.    When uploading contacts from a spreadsheet or .csv file, the user can also save those contacts to a new or pre-existing group using the "Add to Group" feature on the "Upload File" tab. The appropriate group can be selected from a drop-down menu, pictured below. *EZ Texting How to: Mass Upload Contacts*, *available at*

https://www.youtube.com/watch?time_continue=120&v=mbaODcnpWsU (last accessed 10/1/2018).

1630256.9



46.     Uploaded contacts can also be added to groups by querying the user's contacts database, mass selecting contacts from the database, and then selecting the "Add to Group" button, pictured below.  *EZ Texting How to: Mass Upload Contacts*, *available at* https://www.youtube.com/watch?time_continue=120&v=mbaODcnpWsU (last accessed 10/1/2018).

- 17 -



47.     Because the EZ Texting System has the capacity to store phone numbers from a list, it satisfies the requirements of the first component of the definition of an automated telephone dialing system set forth in 47 U.S.C. 227(a)(1)(A).

**B.      The EZ Texting System Has the Capacity to Store Phone Numbers Using a Random Number Generator or Sequential Number Generator.**

48.     Although the EZ Texting System need not have the capacity to store phone numbers using a random or sequential number generator in order to satisfy the requirements of 47 U.S.C. 227(a)(1)(A), it has that capacity.

49.     Because phone numbers can be uploaded to and stored on the EZ Texting System from a Microsoft Excel spreadsheet, the EZ Texting System is capable using Microsoft Excel's "RANDBETWEEN" function, one of the random number generator features available on Microsoft Excel.  Upon information and belief, this function is available in all versions of Microsoft Excel.  The function is easy to use and requires only limited familiarity with Microsoft

- 18 -

Excel.  To use the function to generate a random number, the user needs only to type the function and two integers that the desired random number should fall between.  Using this feature, it is simple to generate a list of a million random telephone numbers.

        a.      For example, to create a list of random area codes and telephone numbers using Microsoft Excel, a user can type the function "=RANDBETWEEN(1001000000, 9999999999)" and paste that value throughout a column.  A random ten digit number will appear in every cell containing that function.  Using this method, a user can create a spreadsheet containing over 1,000,000 randomly generated telephone numbers in less than five minutes, and, to test this allegation, Plaintiff's counsel did in fact generate such a list of telephone numbers in less than a minute using these steps before this Complaint was filed.  Such a spreadsheet would like this:



To store such a list of random phone numbers to the EZ Texting System, the user needs only to format this spreadsheet for compatibility with the EZ Texting System's upload

1630256.9

templates and upload it to the EZ Texting System for storage. Creating and uploading such a list to the EZ Texting System should not require the alteration or modification of any software code in Microsoft Excel or the EZ Texting System.

b. Similarly, to create a list of random telephone numbers from the same area code using Microsoft Excel, a user can type an area code in column A and in column B enter the following text: "=RANDBETWEEN(1000000, 9999999)." Once one row like this has been created, an entire spreadsheet spanning over 1,000,000 randomly generated phone numbers can be created easily. Using this method, a user can create a spreadsheet containing over 1,000,000 randomly generated telephone numbers in less than five minutes, and, to test this allegation, Plaintiff's counsel did in fact generate such a list of telephone numbers in less than a minute using these steps before this Complaint was filed. Such a spreadsheet would like this:



The user then needs only to format this spreadsheet for compatibility with the EZ Texting

System's upload templates and upload it to the EZ Texting System for storage.[4]  Creating

---

[4] Over 1,000,000 populated area code and phone number entries in Columns A and B can be easily merged into over 1,000,000 phone numbers using the "concatenate" function on Microsoft Excel.  This would also take less than five minutes and requires no alteration to any software code.

1630256.9

and uploading such a list to the EZ Texting System should not require the alteration or modification of any software code in Microsoft Excel or the EZ Texting System.

50.     Because a list of phone numbers can be uploaded to and stored on the EZ Texting System from a Microsoft Excel spreadsheet, the EZ Texting System is also capable using Microsoft Excel's as a sequential number generator.  For example, to create a list of consecutively sequential[5] telephone numbers using Microsoft Excel, a user can type an area code in column A and in column B enter "1111111."  Then, in the next row in column B, the user can type "=B2+1" and paste that value throughout the rest of column B (i.e. to the last row in the document).  This will generate a list of over 1,000,000 consecutively sequential phone numbers. Using this method, a user can create a spreadsheet containing over 1,000,000 consecutively sequential telephone numbers in less than five minutes, and, to test this allegation, Plaintiff's counsel did in fact generate such a list of telephone numbers in less than a minute using these steps before this Complaint was filed.  Such a spreadsheet would like this:

---

[5] The example of consecutively sequential numbers is presented as an illustrative example and does not concede that the term "sequential" is limited to consecutively sequential.

1630256.9



The user then only needs to format the spreadsheet for compatibility with the EZ Texting

System's upload templates and upload it to the EZ Texting System for storage. Creating and

uploading such a list to the EZ Texting System should not require the alteration or modification of any software code in Microsoft Excel or the EZ Texting System.

51.     Moreover, the EZ Texting System has the capacity to store phone numbers that a user copies and pastes from a separate list, any list of random or sequential phone numbers can be stored on the EZ Texting System.  The list simply needs to be created, copied and pasted to the EZ Texting System interface.  Any electronic list of random or sequential phone numbers (including spreadsheets constructed using Excel's own capabilities to randomly or sequential generate phone numbers) can therefore be stored on the EZ Texting System by using the ubiquitous copy and paste function that is available on practically every computer operating system.

**C.    The EZ Texting System Has the Capacity to Dial, and Send Text Messages to, the Phone Numbers Stored on the EZ Texting System.**

52.     Once a list of phone numbers is stored onto the EZ Texting System, a user can configure a campaign that causes text messages to be sent to every phone number on the stored list, without requiring the user to dial the phone numbers on the list or to type the text of the message for each transmission (i.e. the user only has to type the message once, regardless of how many phone numbers receive the message).  Configuring such a mass texting campaign takes four simple steps.  According to EZ Texting, Inc.'s instructions, those steps are:

1. Log in to your EZ Texting account.
2. In your dashboard, click Send Now in the Send Text Messages box, or click New Message in the left nav tab
3. Select who you'd like to send the text to, fill out the fields, then select Continue.
4. On the next screen, confirm or edit your text, and when you're ready, select Send Message.

1630256.9

EZ Texting Website, *available at* https://www.eztexting.com/help/getting-started (last accessed 10/1/2018).  Cumulatively, these four steps take a handful of minutes to execute.

a.      Step 1 involves logging into the user's account using an identifier and a password.  Step 1 does not require the user to dial or manually type phone numbers.

b.      Step 2 involves selecting "Send Group Message" from the "New Message" button, pictured below.  *See Getting Started with EZ Texting!*, *available at* https://www.youtube.com/watch?v=arzbDSNdGXY (last accessed 10/1/2018).  Step 2 does not require the user to dial or manually type phone numbers.



c.      Step 3 involves selecting the "Groups" of stored phone numbers that will receive text messages as part of the campaign, and then typing the message that will be sent and selecting the time of delivery. Screenshots of this step are pictured below.  *See Getting Started with EZ Texting!*, *available at* https://www.youtube.com/watch?v=arzbDSNdGXY (last accessed 10/1/2018).  When

- 26 -

1630256.9

typing the message, the user has the option of "personalizing" the message automatically by using a standard tool that "add[s] the real name [of the recipient] in automatically when the message gets sent."  *See* EZ Texting Support, "Send a Text," *available at* https://answers.eztexting.com/hc/en-us/articles/360002314173-Send-a-Text (last accessed 10/1/2018).  Step 3 does not require the user to dial or manually type phone numbers.



1630256.9



       d.       Step 4 involves reviewing the information that was provided during Step 3 and hitting a "Send" button.  A screenshot of Step 4 is pictured below.  *See Getting Started with EZ Texting!*, *available at* https://www.youtube.com/watch?v=arzbDSNdGXY (last accessed 10/1/2018).  Step 4 does not require the user to dial or manually type phone numbers.  According to EZ Texting, Inc., after a user hits sends, "Your contacts will receive your message instantly." *See id.*

- 28 -



53.     By following these easy steps and hitting send, text messages are automatically sent to stored lists containing potentially thousands of phone numbers, without requiring a human to manually type the text message multiple times or to manual dial or type the phone numbers that receive the text messages.  Executing these steps takes less than five minutes, as demonstrated by the fact that the entire video demonstration walking through these steps is less than five minutes.  *See Getting Started with EZ Texting!*, *available at* https://www.youtube.com/watch?v=arzbDSNdGXY (last accessed 10/1/2018).

54.     Because the EZ Texting System (a) has the present capability to store phone numbers from an Excel spreadsheet or .csv file into "Groups" and (b) to send text messages to all the phone numbers in a group without manually typing or dialing the phone numbers stored in the "Groups"), the EZ Texting System is an Automated Telephone Dialing System within the meaning of the Telephone Consumer Protection Act.

## CLASS ACTION ALLEGATIONS

55.    Plaintiff incorporates by reference all other paragraphs of this Complaint as if fully stated herein.

56.    Plaintiff brings this action individually and on behalf of all other persons similarly situated (hereinafter referred to as "the Class") pursuant to Federal Rule of Civil Procedure 23.

57.    Plaintiff proposes the following Class definition, subject to amendment as appropriate:

> All persons within the United States who received a non-emergency text message
> on or after August 13, 2014 sent by MetLife employee Rick Lee or his office,
> advertising insurance products or services to be provided by MetLife.

Collectively, all these persons will be referred to as "Class members." Plaintiff represents, and is a member of, the Class.

58.    Excluded from the Class are MetLife, and any entities in which MetLife has a controlling interest; MetLife's agents and/or employees; any Judge to whom this action is assigned and any member of such Judge's staff and immediate family; claims for personal injury, wrongful death and/or emotional distress.

59.    Plaintiff does not know the exact number of members in the Class, but Plaintiff reasonably believes Class members to number at least 8,000.

60.    Plaintiff and all members of the Class have been harmed by the acts of the MetLife, because their privacy has been violated, they were subject to annoying and harassing texts that constitute a nuisance, they temporarily lost legitimate use of their cell phones in having to deal with the texts, and they were charged for incoming texts.

61.    This Class Action Complaint seeks injunctive relief and money damages.

62.    The joinder of all Class members is impracticable due to the size and relatively modest value of each individual claim.

63.    Additionally, the disposition of the claims in a class action will provide substantial benefit to the parties and the Court in avoiding a multiplicity of identical suits.

64.    Further, the Class can be identified through records maintained by MetLife, its employees and/or agents, and/or the third party texting service.

65.    There are well defined, nearly identical, questions of law and fact affecting all parties.

66.    The questions of law and fact, referred to above, involving the class claims predominate over questions which may affect individual Class members.

67.    Such common questions of law and fact include, but are not limited to, the following:

    a.    Whether the EZ Texting System used by MetLife is an automatic telephone dialing system;

    b.    Whether MetLife can meet its burden of showing it obtained and possessed prior express written consent (*i.e.*, written consent that is clearly and unmistakably stated), to make such texts before such texts were made;

    c.    Whether MetLife's conduct was knowing and/or willful;

    d.    Whether MetLife is liable for statutory damages; and

    e.    Whether MetLife should be enjoined from engaging in such conduct in the future.

- 31 -

1630256.9

68.     As persons who received non-emergency texts from an automatic telephone dialing system, without their prior express written consent within the meaning of the TCPA, Plaintiff asserts claims that are typical of each Class member who also received such texts.

69.     Further, Plaintiff will fairly and adequately represent and protect the interests of the Class.

70.     Plaintiff has no interests which are antagonistic to any member of the Class.

71.     Plaintiff has retained counsel experienced in handling class action claims involving violations of federal consumer protection statutes, including claims under the TCPA.

72.     A class action is the superior method for the fair and efficient adjudication of this controversy.

73.     Classwide relief is essential to compel MetLife to comply with the TCPA.

74.     The interest of the Class members in individually pursuing claims against MetLife is slight because the statutory damages for an individual action are relatively small and are therefore not likely to deter MetLife from engaging in the same behavior in the future.

75.     Management of these claims is likely to present significantly fewer difficulties than are presented in many class claims because the texts at issue are all automated and the Class members, by definition, did not provide the prior express written consent required under the statute to authorize such texts to their cellular telephones.

76.     MetLife has acted on grounds generally applicable to the Class, thereby making final injunctive relief and corresponding declaratory relief with respect to the Class as a whole appropriate.

- 32 -

77.    Moreover, on information and belief, Plaintiff alleges that the TCPA violations complained of herein are substantially likely to continue in the future if an injunction is not entered.

## CAUSES OF ACTION

## FIRST COUNT

## STATUTORY VIOLATIONS OF THE TELEPHONE CONSUMER PROTECTION ACT 47 U.S.C. § 227 *ET SEQ.*

78.    Plaintiff incorporates by reference the foregoing paragraphs of this Complaint as if fully set forth herein.

79.    The foregoing acts and omissions of MetLife constitutes numerous and multiple violations of the TCPA, including but not limited to each of the above cited provisions of 47 U.S.C. § 227 *et seq.*

80.    MetLife is liable for the acts and omissions of its employee Rick Lee and any other employees that used an automated telephone dialing system to send unsolicited text messages, under the doctrines of respondeat superior, apparent authority, and/or ratification.

81.    As a result of MetLife's violations of 47 U.S.C. § 227 *et seq.*, Plaintiff and Class members are entitled to an award of $500 in statutory damages for each and every call and text in violation of the statute, pursuant to 47 U.S.C. § 227(b)(3)(B).

82.    Plaintiff and Class members are also entitled to and do seek injunctive relief prohibiting MetLife's violation of the TCPA in the future.

83.    Plaintiff and Class members are also entitled to an award of attorneys' fees and costs.

## SECOND COUNT

## KNOWING AND/OR WILLFUL VIOLATIONS OF THE TELEPHONE CONSUMER PROTECTION ACT, 47 U.S.C. § 227 *ET SEQ*.

84.     Plaintiff incorporates by reference all other paragraphs of this Complaint as if fully stated herein.

85.     The foregoing acts and omissions of MetLife constitute numerous and multiple knowing and/or willful violations of the TCPA, including but not limited to each of the above-cited provisions of 47 U.S.C. § 227 *et seq.*

86.     MetLife is liable for the acts and omissions of Rick Lee and his or her subordinates, as well as any other employees that used an automated telephone dialing system to send unsolicited text messages, under the doctrines of respondeat superior, apparent authority, and/or ratification.

87.     As a result of the MetLife's knowing and/or willful violations of 47 U.S.C. §  227 *et seq.*, Plaintiff and each member of the Class is entitled to treble damages of up to $1,500 for each and every call and text in violation of the statute, pursuant to 47 U.S.C. § 227(b)(3).

88.     Plaintiff and all Class members are also entitled to and do seek injunctive relief prohibiting such conduct violating the TCPA by MetLife in the future.

89.     Plaintiff and Class members are also entitled to an award of attorneys' fees and costs.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that the Court grant Plaintiff and all Class members the following relief against MetLife:

A.     Injunctive relief prohibiting such violations of the TCPA by MetLife in the future;

- 34 -

B.      As a result of MetLife's willful and/or knowing violations of 47 U.S.C.

§ 227(b)(1), Plaintiff seeks for himself and each Class member treble damages, as provided by

statute, of up to $1,500 for each and every call and text that violated the TCPA;

C.      As a result of MetLife's statutory violations of 47 U.S.C. § 227(b)(1), Plaintiff

seeks for himself and each Class member $500 in statutory damages for each and every call and

text that violated the TCPA;

D.      An award of reasonable attorneys' fees and costs to counsel for Plaintiff and the

Class, to be paid from the common fund judgment;

E.      An order certifying this action to be a proper class action pursuant to Federal Rule

of Civil Procedure 23, establishing an appropriate Class and any Subclasses the Court deems

appropriate, finding that Plaintiff is a proper representative of the Class, and appointing the

lawyers and law firms representing Plaintiff as counsel for the Class;

F.      Such other relief as the Court deems just and proper.

## **DEMAND FOR JURY TRIAL**

Plaintiff demands a trial by jury on all counts so triable.

Dated: October 25, 2018                By:  ___/s/ Peter N. Wasylyk_____

Peter N. Wasylyk (R.I. Bar # 3351)
LAW OFFICES OF PETER N. WASYLYK
1307 Chalkstone Avenue
Providence, Rhode Island 02908
Telephone: 401-831-7730
Facsimile: 401-861-6064
Email: pnwlaw@aol.com

LIEFF CABRASER HEIMANN & BERNSTEIN, LLP
Jonathan D. Selbin*
Email:  jselbin@lchb.com
250 Hudson Street, 8th Floor
New York, NY  10013
Telephone:  (212) 355-9500
Facsimile:  (212) 355-9592

LIEFF CABRASER HEIMANN & BERNSTEIN, LLP
Daniel M. Hutchinson*
Email:  dhutchinson@lchb.com
275 Battery Street, 29th Floor
San Francisco, California  94111-3339
Telephone:  (415) 956-1000
Facsimile:  (415) 956-1008

MEYER WILSON CO., LPA
Matthew R. Wilson*
Email:  mwilson@meyerwilson.com
Michael J. Boyle, Jr.
Email:  mboyle@meyerwilson.com
1320 Dublin Road, Ste. 100
Columbus, Ohio 43215
Telephone:  (614) 224-6000
Facsimile:  (614) 224-6066

- Pro Hac Vice Forthcoming

*Attorneys for Plaintiff and the Proposed Class*

1630256.9